IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RODNEY N. WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-00027 |
| | ) | |
| RENT TO OWN AUTO CENTERS, LLC, | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE NEWBERN |
| Defendant. | ) | |

## **MEMORANDUM**

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 21). Plaintiff filed a Response in Opposition (Doc. No. 27). Defendant filed a Reply (Doc. No. 40) and a Supplemental Brief (Doc. No. 48). Defendant also moved to strike Plaintiff's Declaration filed in response to the motion for summary judgment (Doc. No. 37). Plaintiff filed a Response in Opposition to the motion to strike (Doc. No. 42), and Defendant filed a Reply (Doc. No. 44). For the reasons discussed below, Defendant's Motion to Strike Plaintiff's Declaration (Doc. No. 37) and Motion for Summary Judgment (Doc. No. 21) are **DENIED**.

### I. MOTION TO STRIKE

Defendant took Plaintiff's deposition on December 19, 2018. Six months later, Plaintiff filed his Declaration. Defendant moves, pursuant to Federal Rule of Civil Procedure 56, to strike Plaintiff's declaration in its entirety from the summary judgment evidence on the grounds that it contains contradictions to what Plaintiff previously testified to in his deposition.

**A. Standard of Review**

Federal courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous

sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (collecting cases). To address the problem, courts, including the Sixth Circuit, have developed the "sham affidavit doctrine" which "prevents a party from submitting a new affidavit to manufacture a factual dispute by contradicting an earlier testimony." *Webb v. United States*, 789 F.3d 647, 660–61 (6th Cir. 2015).

Not every post-deposition affidavit or declaration is prohibited, however. Rather, a distinction must be made between legitimate efforts to supplement or clarify the record, and attempts to create sham issues to stave off summary judgment and force an unnecessary trial. *See Cossairt v. Jarrett Builders, Inc.*, 292 F. Supp. 3d 779, 782 (M.D. Tenn. 2018). In discussing the sham affidavit doctrine, the Sixth Circuit has instructed that:

> [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony....A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction....If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). (internal citations omitted). With regard to the issue of whether the affidavit attempts to create a sham issue of fact, the *Aerel* court went on to endorse a "non-exhaustive list of factors" that asks " 'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.'" *Cossairt*, 292 F. Supp. 3d at 783 (quoting *Aerel,* 448 F.3d at 908-09).

## B. Analysis

First, Defendant argues the statement in Plaintiff's Declaration that "During this employment, I answered to Mary Margaret ("Meg") Meyer and Kirk Bowman." is in direct contradiction to his deposition testimony regarding his supervisors and members of management:

Q. And who was your supervisor at Rent to Own here in Nashville?

A. Kirk.

Q. Bowman?

A. Kirk Bowman.

\* \* \*

Q. And what was your understanding of what Ms. Meyer's job was?

A. When I was first hired, pretty much she was controlling the paperwork, the contract so to speak; payments, if there was any discrepancies there; and Kirk was in charge of the sales, the process of sales, and that I pretty much reported to him.

Q. And do you know – so you reported to Kirk Bowman, right?

A. That's what he told me I was supposed to do.

(Doc. No. 21-1 at PageID #70). However, in setting forth the foregoing colloquy, Defendant omits the following exchange between counsel and Plaintiff:

Q. And who was – and who did you understand to be like a member of management? Another member of management? Folks from Saint Louis?

A. Yes, and Meagan.

Q. Meagan? Are you talking about Meg Meyer?

A. Yes.

Q. You understood Meg Meyer to be a member of management?

A. Yes.

Q. What gave you that understanding?

3

> A. Because that's what I was told.
>
> Q. By whom?
>
> A. Kirk, when I first got hired, that she was like an office manager.

(*Id*.). When viewed in entirety, it is clear that Plaintiff's deposition testimony does not directly contradict Plaintiff's statement in his Declaration that he answered to Ms. Meyer and Mr. Bowman.

Defendant also argues that, in two paragraphs of his Declaration, Plaintiff claims everyone in the office was within sight and speaking distance of one another and that Mr. Bowman's remarks and gestures made within the office would be within the sight and hearing of people present in the office, when Plaintiff "admitted in his deposition that he was unsure whether Ms. Meyer or Mr. Busby heard Mr. Bowman's comments…" (Doc. No. 38 at 6-7). As sole support for its argument, Defendant relies on Plaintiff's deposition responses to questions about whether he knew "for sure" if Ms. Meyers or Mr. Busby heard Mr. Bowman's alleged comment "you need to straighten your hat up because you're starting to look like your brother from the projects." (Doc. No. 38 at 6-7; Doc. No. 21-1 at PageID # 76-77, 75). Plaintiff's testimony that he was not sure whether Ms. Meyers or Mr. Busby heard a specific comment made by Mr. Bowman is not contradictory to Plaintiff's statements in his Declaration that office space was an open environment where everyone was generally within speaking and hearing distance of one another and that Mr. Bowman's actions would likewise be generally within speaking and hearing distance of others present in the office.

Defendant argues the statement in Plaintiff's Declaration that "There were other and numerous racially derogatory remarks consistent with the foregoing that I cannot recall." is inconsistent with his deposition testimony because he "never once testified that there were additional comments" when he was asked whether he had any other evidence in support of his racial harassment claim. (Doc. No. 38 at 7-8). Plaintiff testified in his deposition:

4

> Q. Any other incidents or comments that you haven't talked about today?
>
> A. Not that I can recall because a lot of that stuff that I talked about was happening periodically a day-to-day basis.
>
> * * *
>
> Q. Any other comments that I haven't gone over? Any other comments? Any other evidence that you have in support of your racial harassment claim?
>
> A. Not that I can recall.

(Doc. No. 21-1 at PageID # 79-80). Plaintiff's deposition testimony does not contradict the statement in his Declaration that there were other statements made that he cannot recall. Nor does Plaintiff's statement in his Declaration appear to have been submitted as an attempt to create a sham fact issue.

Defendant also argues the statement in Plaintiff's Declaration that "[a]ll of Kirk Bowman's racial remarks, imitations and gestures continued in an incessant and harassing manner; and related all to my wife" is directly contradictory to his deposition testimony regarding the frequency of Mr. Bowman's alleged racial remarks. (Doc. No. 38 at 9). The Court has read the filed excerpts of Plaintiff's deposition in conjunction with his Declaration. Based upon that review, the Court finds Plaintiff's statements at issue in his Declaration do not directly contradict his deposition testimony.

Finally,[1] Defendant argues the statements in Plaintiff's Declaration that "[n]othing thereafter happened to stop Kirk Bowman's harassment and I became very despaired and emotionally and mentally anguished as to what to expect each day. As a result, I suffered from a

---

[1] Defendant also argues that multiple statements in Plaintiff's Declaration contradict his deposition testimony regarding what he expected of Ms. Meyer when he allegedly reported Mr. Bowman's harassing conduct to her. (Doc. No. 38 at 8-9). Defendant argues that Plaintiff's statements in his Declaration are offered to create a sham fact issue regarding whether he provided notice to Defendant of Mr. Bowman's alleged harassment. The Court declines to address this argument as it pertains to an issue raised in Defendant's motion for summary judgment that the Court does not reach due to the existence of other genuine issues of material fact.

lack of sleep and interest in my work and presented a melancholy state at home. I could not cope with the situation and had to eventually quit my job on April 12, 2017" are in direct contradiction to his deposition testimony regarding why he quit his job:

> Q. So April 12th you call -- April 12th is the day and you call Ms. Meyers. So why did you make the decision to call in that day?
>
> A. Because I was stressed. I was at my limit.
>
> Q. Was there any incident that led you to call in on that morning on April 12, 2017?
>
> A. I mean I guess it was a line of several events. It's almost like the straw that broke the camel's back. I mean, you know, taking the work home with me, and being stressed, and financially just put in a spot because mentally I cannot get into it, and plus it wasn't the best move financially for me to even work there but my back was against the wall to where I needed to take the job. So I was just in a dark -- I was in a dark place the whole time I was there.
>
> Q. But why April 12th? I mean had there been an incident that happened on April 11th? Was there -- because I asked you, I said what was the straw? Was there a singular incident that caused you to say, "I'm calling in. That's it. I'm done. I'm done now."?
>
> A. I mean just talking to my wife, and looking at the bills, and looking at all the issues, I made a phone call to Greenlight I think the following day -- I mean that day before I quit and called in. That's the reason why I knew I had another job and I told her I wasn't coming back.
>
> I called Greenlight and they were saying, "Hey, man, we was thinking about you the other day. We're glad you called. I'm going to reach out to Kevin." And Kevin ended up calling me.
>
> Q. Kevin, the owner?
>
> A. Yes. He said, "Hey, man, you need to hurry up and get on back, man."
>
> Q. Did you start looking for -- when did you start looking for another job?
>
> A. The day before I called in to Megan, I called Greenlight.
>
> Q. So that's the first place you called?
>
> A. That's the only place I called.

6

> Q. And so you left the next day because you knew you were going to go work at Greenlight. Is that right?
>
> A. Yes.

(Doc. No. 21-1 at PageID # 88). This testimony does not directly contradict Plaintiff's statements in his Declaration that he quit working for Defendant because he could not emotionally or mentally cope with the work environment created by Mr. Bowman's harassment.

For the foregoing reasons, Defendant's Motion to Strike (Doc. No. 37) is **DENIED**.

## II. MOTION FOR SUMMARY JUDGMENT

Having decided not to strike Plaintiff's Declaration, the Court can now resolve Defendant's Motion for Summary Judgment.

### A. Factual and Procedural Background

Plaintiff, an African-American man, began working as a car lease salesman for Defendant Rent to Own Auto Centers, LLC ("RTO") at its Madison office on December 10, 2016. (Doc. No. 29 ¶¶ 25-26). Plaintiff's last day of work was April 12, 2017. (Doc. No. 1 ¶ 10; Doc. No. 21-8). During his employment, Plaintiff was the only African-American employee who worked at the Madison office. (Doc. No. 29 ¶ 36). At that time, there were seven other employees working at the Madison office: Plaintiff's supervisor, Kirk Bowman; the officer manager, Meg Meyer; another car lease salesman, Ryan Busby; two service technicians; one lube technician; and one detailer. (Doc. No. 29 ¶ 35; Doc. No. 48-1 at PageID # 393). The office area had an open floorplan, such that actions in the office area were generally observable by people present in the office and persons in the office area were generally within speaking distance of one another. (Doc. No. 39 ¶¶ 7-8; Doc. No. 27-2 ¶ 3; Doc. No. 48-1 at PageID # 406; Doc. No. 27-3 ¶ 3).

During Plaintiff's four-month tenure at RTO, almost every time a black customer called in or came in with a problem that they could not make their car payment, Plaintiff's supervisor, Mr.

Bowman, would ridicule them by "turning down" a lip and attempting to imitate their "talk" with statements such as, "well the problem was …" (Doc. No. 39 ¶ 22; Doc. No. 27-2 ¶ 4). One of the service technicians, Brian Kortz, testified that he observed Mr. Bowman constantly talking down to black people and attempting to imitate black people in his "talk" and by "sticking out" his lips. (Doc. No. 27-2 ¶ 4; Doc. No. 48-1 at PageID # 408, 413-414). Mr. Kortz further testified that Mr. Bowman would make other remarks "where you could tell what he was talking about….Like about black people and they don't pay." (Doc. No. 48-1 at PageID # 413-414). Mr. Kortz felt "extremely uncomfortable" and found it "very disturbing" when Mr. Bowman did these things in the presence of Plaintiff. (Doc. No. 27-2 ¶¶ 4-5). Ms. Meyer and Mr. Busby also observed Mr. Bowman's imitations, but neither of them viewed his actions as making fun of African-Americans. (Doc. No. 21-2 ¶ 6; Doc. No. 21-7 ¶ 4).

Around the third month of Plaintiff's four-month long employment at RTO, Mr. Bowman started making remarks ridiculing and singling out Plaintiff's race on a regular basis. (Doc. No. 21-1 at PageID # 75; Doc. No. 27-3 ¶ 4). The first incident, Mr. Bowman told Plaintiff "you need to straighten your hat up because you're starting to look like your brother from the projects." (Doc. No. 21-1 at PageID # 75; Doc. No. 29 ¶ 56; Doc. No. 39 ¶ 20). Plaintiff testified that he was shocked by Mr. Bowman's statement and felt like it was "a punch in the gut." (Doc. No. 21-1 at PageID # 75). Mr. Bowman continued to make statements about Plaintiff "starting to look like your brother from the projects" on four or five other occasions during the last four to five weeks of his employment. (Doc. No. 29 ¶¶ 58, 59; Doc. No. 39 ¶ 19). Mr. Bowman frequently made statements that Plaintiff had lost customers because he was black, that customers did not like Plaintiff because he was black, and that customers did not want to deal with Plaintiff because he was black. (Doc No. 21-1 at PageID # 76, 78; Doc. No. 29 ¶¶ 60-61). Mr. Bowman also repeatedly

told Plaintiff "you're not one of us" when Plaintiff was the only non-Caucasian employee in the office. (Doc No. 21-1 at PageID # 81, 77-78). Plaintiff did not see Mr. Bowman telling the other salesman "you're not one of us" and he took Mr. Bowman's statements to mean "you're not one of us white people." (Doc. No. 21-1 at PageID # 77-78). Plaintiff testified that he reported Mr. Bowman's harassing conduct to the office manager, Ms. Meyer, on a daily basis. (Doc. No. 21-1 at PageID# 81, 84-85). Ms. Meyer testified that she has no recollection of Plaintiff's alleged complaints regarding Mr. Bowman's conduct. (Doc. No. 21-3 at PageID # 102-106).

On another occasion, Mr. Bowman asked Plaintiff to use his personal Facebook account to contact an African-American customer who was in default because Plaintiff was black and Mr. Bowman wanted him to ask the customer out on a date so Defendant could recover her car. (Doc No. 29 ¶¶ 64-66; Doc. No. 39 ¶ 23). Plaintiff was upset by Mr. Bowman's suggestion and reported the incident to the office manager, Ms. Meyer. (Doc. No. 27-3 ¶ 7). Ms. Meyer communicated with an employee at Defendant's corporate office about the Facebook incident, however, she testified that she only did so to obtain a second opinion about whether employees should friend a customer on Facebook for purposes of locating the customer. (Doc. No. 21-3 at PageID # 102-103; Doc. No. 39 ¶ 24).

Plaintiff testified that at the end of his employment with RTO he was stressed and at his limit; that he had been "taking the work home" with him and mentally could not get into the work. (Doc. No. 21-1 at PageID # 88). He testified that he felt like Mr. Bowman was trying to break him down mentally. (Doc. No. 21-1 at PageID # 81). Plaintiff's wife provided testimony that Plaintiff became despondent and reclusive at home. (Doc. No. 27-4 ¶ 2). Plaintiff alleges that he was forced to resign on April 12, 2017, as a result of the work environment becoming so intolerable that he was not able to stay. (Doc. No. 1 ¶ 10).

Plaintiff filed this action on January 8, 2018, alleging Defendant had created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e, *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). (Doc. No. 1). Defendant moves for summary judgment on all claims. (Doc. No. 21).

**B. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**C. Analysis**

Title VII and Section 1981 both prohibit discrimination based on race that creates a hostile or abusive work environment.[2] To establish a *prima facie* case of a racially hostile work environment under Title VII, Plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon race; (4) the harassment created a hostile work environment; and (5) employer liability exists for such harassment. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

In this case, there is no dispute that Plaintiff, as an African American, is a member of a protected class or that Plaintiff was subjected to unwelcome harassment based on his race. However, Defendant argues both that the alleged harassment was not sufficiently severe or pervasive enough to create a hostile work environment and that there is no basis for employer liability.

1. <u>Whether the Conduct was Sufficiently Severe or Pervasive</u>

To satisfy the fourth prong of his hostile work environment claims, Plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that he subjectively perceived it to be so. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether a reasonable person would consider an environment hostile or abusive, a court must consider the "totality of the circumstances." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Under this test, the court must consider the work environment as a whole and all the alleged incidents of harassment for their cumulative effect. *See Williams v. Gen. Motors Corp.*, 187 F.3d

---

[2] Section 1981 claims are reviewed "under the same standards as claims of race discrimination brought under Title VII." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Accordingly, although Plaintiff has asserted his hostile work environment claims under Title VII and Section 1981, the Court need only conduct a single analysis under Title VII.

11

553, 562-63 (6th Cir. 1999) ("the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.") (emphasis in original).

Factors relevant to this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The Court may consider conduct and/or comments which disparage or single out members of a protected class of which the plaintiff is a member, even if the conduct and/or comments were directed at someone other than the plaintiff, because such evidence is relevant not only to whether a work environment was objectively hostile, but also to whether the plaintiff belonging to the protected class subjectively perceived the work environment as one hostile to him. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660-61 (6th Cir. 1999). Furthermore, "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work environment analysis when it can be shown that but for the employee's race, []he would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706-07 (6th Cir. 2007) ("Given that [Plaintiff] was the only black employee in her work area and that she alleges that [her supervisor] disciplined her for things for which he did not discipline her co-workers, [Plaintiff] has created an inference, sufficient to survive summary judgment, that race was the motivating reason behind [her supervisor]'s behavior. Accordingly, the district court erred in finding otherwise.").

Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

"Summary judgment is appropriate only if the evidence is so one-sided that there is not genuine issue of material fact as to whether there was a hostile work environment." *Hawkins*, 517 F.3d at 333.

In the present case, Plaintiff has provided evidence that his supervisor, Mr. Bowman, continually – on a daily and weekly basis for approximately four to six weeks – engaged in objectively and subjectively offensive, insulting, and hostile actions and comments based on Plaintiff's race. Plaintiff testified that Mr. Bowman ridiculed African-American customers in his presence every day by "turning down" a lip and attempting to imitate their "talk" with statements such as, "well the problem was …" (Doc. No. 21-1 at PageID# 75, 81). Plaintiff also testified that Mr. Bowman told him "you're not one of us" on a daily basis, and that he took Mr. Bowman's statements to mean "you're not one of us white people." (Doc. No. 21-1 at PageID # 81). Plaintiff testified that Mr. Bowman made statements on a weekly basis for the last four to six weeks of his employment that Plaintiff lost customers because he was black and that customers didn't like Plaintiff or didn't want to deal with him because he was black. (Doc No. 21-1 at PageID # 78). Additionally, Plaintiff testified that Mr. Bowman made statements on five or six occasions during the last four to six weeks of his employment about Plaintiff "starting to look like your brother from the projects." (Doc No. 21-1 at PageID # 81).

Defendant argues the Court cannot consider Mr. Bowman's imitations of African American customers in its hostile work environment analysis because there is no evidence that these imitations could objectively be seen as an attack on those customers' race. (Doc. No. 22 at 7-8). However, Plaintiff has produced evidence that another RTO employee who witnessed Mr. Bowman's imitations, Mr. Kortz, also viewed them as being race-based and offensive to African-Americans. (Doc. No. 27-2; Doc. No. 48-1 at PageID # 408, 413-414). Accordingly, the Court will

not exclude Mr. Bowman's imitations from consideration. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660-61 (6th Cir. 1999).

Defendant also argues the Court cannot consider Mr. Bowman's "you're not one of us" statements in its hostile work environment analysis because the statement is too vague to constitute evidence of racial harassment. (Doc. No. 22 at 5-6). However, Plaintiff being the only African-American employee and having testified that Mr. Bowman did not make the same or similar statements to the other salesman combined with the other race-specific comments made by Mr. Bowman, (*see* Doc. No. 21-1 at PageID # 72, 77-78), create an inference that Plaintiff's race was the motivating factor behind Mr. Bowman's statements. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706-07 (6th Cir. 2007). Therefore, the Court will not exclude Mr. Bowman's "you're not one of us" statements from consideration. *See id*.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court finds that a reasonable jury could determine under the totality of the circumstances that Plaintiff was subjected to a racially hostile work environment. *See Hawkins*, 517 F.3d at 333–34 (Summary judgment is improper if the plaintiff advances evidence of harassment that is "ongoing," "commonplace," and "continuing.").

2. Employer Liability

The last element of a hostile work environment claim is employer liability. In hostile work environment cases in which the harasser is a supervisor, the employer is strictly liable if the supervisor's harassment culminates in a tangible employment action. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the supervisor's harassment did not result in a tangible employment action, the employer may raise an affirmative defense to liability by establishing, by a preponderance of the evidence, that (1) the employer exercised reasonable care to prevent and

correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id*.; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

Under the first element of the affirmative defense, an employer has a duty to prevent racial harassment by its supervisors. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999) (citing *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 764-65)). The existence of an effective policy with complaint procedures can satisfy the first element of the affirmative defense. *See Ellerth*, 524 U.S. at 745. Proof that an employee failed to utilize any of the corresponding antiharassment complaint procedures "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id*.

The Sixth Circuit has held that an effective anti-harassment policy should at least: (1) require supervisors to report incidents of unlawful harassment; (2) allow employees to make both formal and informal complaints of harassment; (3) provide a method for employees to bypass a harassing supervisor when making a complaint; (4) and provide for training concerning the policy. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005). In the present case, Defendant's anti-harassment policy in effect at the time provided that:

> Rent to Own Auto Centers is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Rent to Own Auto Centers will not tolerate unlawful actions, words, jokes, or comments based on a person's sex, race, color, national origin, age, religion, disability, or any other legally protected characteristic.
>
> If you experience or witness sexual or other harassment at work, report it immediately to your supervisor. If your supervisor is unavailable or you believe it would be inappropriate to discuss it with your supervisor, you should immediately contact the

> Department Manager or any other member of management. There will not be punishment or reprisal if you report sexual harassment to ask questions or raise concerns about it.
>
> Allegations of sexual harassment will be investigated. To the extent possible, your confidentiality and the confidentiality of any witnesses and all the alleged harasser will be protected against unnecessary disclosure.
>
> Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the Department Manager or any member of management so it can be investigated in a timely and confidential manner. Any employee who engages in sexual or other unlawful harassment must immediately advise the Department Manager or any member of management so it can be investigated in a timely and confidential manner. Any employee who engages in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment.

(Doc. No. 21-4 at PageID # 110; *see also* Doc. No. 29 ¶ 7). Notably, Defendant's anti-harassment policy does not provide for training regarding the policy nor has Defendant produced evidence that it provided any training to employees on its anti-harassment policy. Rather, Ms. Meyers, the office manager who has worked for Defendant since 2014, testified that she is not aware of Defendant having had any seminars or programs regarding harassment in the workplace. (Doc. No. 21-3 at PageID # 98, 105). Indeed, when presented with Defendant's anti-harassment policy in her deposition, Ms. Meyers testified:

> Ms. Meyers: It is in the handbook. It's not actually in this section of the handbook that we're looking at, because this one is for sexual and other harassment. I believe there's another section. There isn't?
>
> Counsel for Defendant: This is it.
> Ms. Meyers: This is it? This is all of it?
>
> Counsel for Defendant: Uh-huh.
>
> Ms. Meyers: So this states everything? It does?
>
> Counsel for Defendant: Yeah.

>       Ms. Meyers:    So it's sex? race? okay.

(Doc. No. 27-1 at PageID # 194). Additionally, Defendant's anti-harassment policy directs employees to report harassment to "the Department Manager", but it is undisputed that Defendant did not have Department Managers as referenced in its policy. (Doc. No. 27-1 at PageID# 195; Doc. No. 39 ¶ 30). The Court finds that the foregoing evidence raises a genuine question of material fact as to whether Defendant had an effective anti-harassment policy. *See Clark*, 400 F.3d 350–51.

Even if Defendant's anti-harassment policy satisfied *Clark* on its face, the affirmative duty to prevent or correct unlawful harassment does not end with the promulgation of a reasonable anti-harassment policy. *Id.* at 349. The first element of the affirmative defense "requires an inquiry that looks behind the fact of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Id*. (citing *Faragher*, 524 U.S. at 806). Under Defendant's policy, all employees were required to report any harassment they experienced or witnessed. However, Defendant has submitted evidence that at least one employee who witnessed Mr. Bowman's behavior, Mr. Kortz, did not report it to a supervisor or other member of management as required by the anti-harassment policy. (Doc. No. 48-1 at PageID # 416). Defendant's anti-harassment policy also required employees who engaged in harassment to immediately self-report their harassment, but Defendant has not come forward with any evidence that Mr. Bowman reported his own behavior to a member of management as required by the anti-harassment policy.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court finds there is a genuine issue of material fact regarding the effectiveness of Defendant's anti-harassment policy. *See Clark*, 400 F.3d at 350. Accordingly, Defendant cannot benefit from the affirmative defense at the summary judgment stage. Because there is a genuine

issue of material fact regarding whether Defendant exercised reasonable care under prong one of the defense, the Court need not decide whether Plaintiff unreasonably failed to take advantage of any complaint procedures. *See id*. at 351 (declining to consider prong two when issues of material fact existed as to prong one).

Based on all of the foregoing, Defendant's Motion for Summary Judgment is **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE